Joanna M. Myers, Esq.
Email: jmm@h2law.com
California Bar No. 289485
Mark J. Gardberg, Esq.
Email: mg@h2law.com
California Bar No. 187796
Robert Rosenthal, Esq.
Email: rlr@h2law.com
California Bar No. 173047
HOWARD & HOWARD ATTORNEYS
3800 Howard Hughes Pkwy., Suite 1000
Las Vegas, NV 89169
Tel: (702) 257-1483

Kevin A. Hoang, Esq.
Email: kah2@h2law.com
California Bar No. 277132
HOWARD & HOWARD ATTORNEYS
9595 Wilshire Blvd., Suite 900
Beverly Hills, CA 90212
Tel: (424) 303-7700

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| CASSANDRA HAZEN, an individual, PAUL HAZEN, an individual, and THE PAUL AND CASSANDRA HAZEN TRUST, a trust, <br><br> Plaintiffs, <br><br> vs. <br><br> LUGANO DIAMONDS & JEWELRY INC., a California corporation, <br><br> Defendants. | Case No: <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Cassandra Hazen, Paul Hazen, and The Paul and Cassandra Hazen Trust (collectively, "Plaintiffs" or the "Hazens"), acting by and through their counsel, Howard & Howard Attorneys PLLC, hereby bring this action against

1

Defendant Lugano Diamonds & Jewelry Inc. ("Defendant" or "Lugano") as follows:

## PARTIES

1. Plaintiffs Cassandra Hazen and Paul Hazen are, and at all relevant times were, citizens of the State of Nevada. Paul and Cassandra Hazen are co-trustees of Plaintiff, The Paul and Cassandra Hazen Trust who is, and at all relevant times was, a citizen of the State of Nevada.

2. Defendant Lugano is and at all relevant times was a California corporation whose principal place of business is located at 620 Newport Center Drive, Suite 800, Newport Beach, California 92660. Lugano is, therefore, a citizen of the State of California.

## JURISDICTION AND VENUE

3. This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. §1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4. This Court has personal jurisdiction over Lugano because: (a) it is a California corporation; (b) it is located in the Southern Division of this judicial district and conducts continuous and systematic business within the State of California; (c) the Hazens' causes of action alleged herein arise from or relate to Lugano's contacts with the State of California; and (d) the exercise of personal jurisdiction over Lugano is otherwise reasonable.

5. This Court is a proper venue for the adjudication of this dispute pursuant to 28 U.S.C. § 1391 because Lugano resides in the Southern Division of this judicial district.

## GENERAL ALLEGATIONS

6. Lugano, which was formed in 2005 by Mordechai Haim "Moti" Ferder ("Ferder"), is in the business of selling high-end jewelry, including but not limited

2

4914-2198-6404, v. 1

to diamonds, to the public.

7. At all relevant times, Ferder was acting as Lugano's Design Director, President Chief Executive Officer ("CEO") and agent.

8. Lugano has approximately one dozen high-end, ultra-luxury retail boutiques across the United States and internationally, in locations such as Aspen, Palm Beach, and London.

9. In 2021, a publicly traded company named Compass Diversified Holdings ("Compass") (NYSE: "CODI"), purchased sixty percent (60%) of Lugano for approximately $256,000,000.

10. The Hazens first came into contact with Lugano in 2021, when Ferder, acting on behalf of Lugano as its Design Director, President and CEO, presented himself to the Hazens as a one-of-a-kind, award-winning, master craftsman and jewelry expert.

11. At that time, the Hazens were interested in buying a rare pink diamond (the "Pink Diamond"). Acting on behalf of Lugano, Ferder and another Lugano colleague flew to Hawaii to show the Pink Diamond to the Hazens, and the Hazens subsequently purchased that gem.

12. Soon thereafter, Ferder, on behalf of Lugano, contacted the Hazens multiple times over the course of several months and asked them to participate in an investment program that Lugano was offering to select high-income customers. Lugano's overtures eventually led to the Hazens agreeing to enter into three separate written contracts with Lugano (collectively, the "Three Contracts"), whereby the parties agreed to purchase, co-own, and resell high-end, multi-carat diamonds for a "30% – 40% profit." The diamonds referenced in the first and third contracts were all over 20 carats in size.

13. On or about February 19, 2021, Ferder, acting on behalf of Lugano, entered into the first written contract with the Hazens (the "First Contract"). Pursuant to the terms of the First Contract, Lugano acquired two diamonds from

D.N., a third party, one for $1,425,000 and the other for $2,850,000, for a combined purchase price of $4,275,000. The Hazens and Lugano each paid fifty percent (50%) of the total purchase price (*i.e.*, $2,137,500). As part of the First Contract, Lugano agreed to maintain insurance for the two diamonds in the amount of $3,150,000 and to be solely responsible for safely storing and maintaining the diamonds. The parties further agreed that Lugano would reimburse the Hazens for the full amount of their investment at any time prior to the diamonds being sold, plus nine percent (9%) annual interest.

14. On or about February 12, 2022, Ferder, on behalf of Lugano, entered into the second written contract with the Hazens (the "Second Contract"), through the Hazens' trust, The BBD 2012 Gift Trust (the "BBD Gift Trust"). The subject of the Second Contract was a 3.30 carat Fancy Vivid Blue diamond (the "Blue Diamond"), which Lugano acquired from Novel for a total purchase price of $5,600,000. Lugano and the Hazens each paid fifty percent (50%) of the total purchase price (*i.e.*, $2,800,000). As part of the Second Contract, Lugano agreed to maintain insurance for the Blue Diamond in the amount of $6,400,000 and to be solely responsible for safely storing and maintaining the diamond. As part of the Second Contract, the parties further agreed that Lugano would reimburse the Hazens for the full amount of their investment (*i.e.*, $2,800,000) at any time prior to the diamonds being sold, plus nine percent (9%) annual interest.

15. On or about January 5, 2023, Ferder, on behalf of Lugano, entered into the third written contract with the Hazens (the "Third Contract"), with virtually identical terms as the First Contract and the Second Contract. Other than the purchase price and the diamonds themselves, the terms of Three Contracts were the same. In the Third Contract, the parties bought two large diamonds from Kothari for a total purchase price of $2,620,000. Plaintiff and Lugano each paid $1,310,000 toward the total purchase price of $2,620,000. Again, the Third Contract stated that Lugano would refund the Hazens their money at any time prior to the diamonds

being sold, plus nine percent (9%) annual interest.

16. The Three Contracts were each drafted by Lugano.

17. In the Three Contracts, the Hazens were fifty percent (50%) co-owners of the specified diamonds with Lugano.

18. In the Three Contracts, each diamond was described via a specific, unique GIA certification number, as well as by carat size, color, clarity rating, and so forth (the "Co-Owned Diamonds"). Additionally, Lugano provided the Hazens with the "GIA Certificate" relating to each of the Co-Owned Diamonds.

19. Given the terms and conditions contained in the Second Contract and Third Contract, which were drafted by Lugano, the Co-Owned Diamonds were not to be purchased following the parties' entry into those agreements; instead, the Co-Owned Diamonds were already in Lugano's inventory. Further, pursuant to the Second Contract and Third Contract, Lugano represented and warranted that the relevant "Diamond was bought" from a specific third-party vendor (*i.e.*, Novel and Kothari).

20. According to all Three Contracts, the Co-Owned Diamonds were not acquired at fair market value; rather, each of the Three Contracts stated that Lugano acquired them at "35%-40% below the wholesale market value for a diamond of similar specifications."

21. Each of the Three Contracts stated that Lugano would market the Co-Owned Diamonds to third-party customers, with the aim of realizing a sale within "a [sic] approximate [sic] 6-12 month timeframe." Further, after each Co-Owned Diamond was sold, Lugano would then tender fifty percent (50%) of the net profit to the Hazens.

22. Each of the Three Contracts stated that the Hazens' anticipated profit would be "30-40% or greater," representing the difference between: (i) the below-market price Lugano had already paid for the Co-Owned Diamonds; and (ii) the market price that Lugano would then be charging. The Three Contracts also

provided that, if it turned out that the Co-Owned Diamonds were of lesser value than represented or they failed to sell within the one-year timeframe, then Lugano "assume[d] the risk" of either such scenario and would return the the Hazens' full investment in cash, together with interest, as stated above.

23. Each of the Three Contracts between the parties contained the following additional material terms: (i) until the sale of each Co-Owned Diamond, Lugano would grant the Hazens access to the diamonds upon request; (ii) until the sale of each Co-Owned Diamond, Lugano would be solely responsible for maintaining, storing, insuring, and appraising those stones; and (iii) following each sale of a Co-Owned Diamond, Lugano would provide the Hazens with "access to all Transaction Paperwork."

24. On or around December 11, 2021, Lugano told the Hazens that the diamonds in the First Contract sold as anticipated for $3,900,000 and sent the Hazens their promised fifty percent (50%) net profit.

25. Lugano only satisfied the terms and conditions of the First Contract to give the Hazens a false sense of trust and security in Lugano and to induce the Hazens into entering into the Second Contract and the Third Contract, which Lugano never intended to honor at the time of contracting.

26. On or about February 16, 2022, the Hazens wired $2,800,000 to Lugano in accordance with the terms of the Second Contract.

27. The Hazens complied with all of the terms of the Second Contract.

28. On or about January 6, 2023, the Hazens wired $1,310,000 to Lugano in accord with the terms of the Third Contract.

29. The Hazens complied with all of the terms of the Third Contract.

30. Lugano breached the terms of the Second Contract and the Third Contract.

31. Throughout 2023 and much of 2024, Lugano kept assuring the Hazens that the Co-Owned Diamonds listed in the Second Contract and in the Third

4914-2198-6404, v. 1

Contract would imminently be sold for a profit.

32. By July 22, 2024, Lugano had still failed to sell the Co-Owned Diamonds identified in the Second Contract and in the Third Contract. The 6-12 month sale periods described in both contracts had now exceeded 18½ and 29 months, respectively.

33. On July 22, 2024, the Hazens advised Lugano that they wanted their money back, plus the nine percent (9%) interest, in accordance with the terms contained in the Second Contract and the Third Contract.

34. In response, Ferder, acting on behalf of Lugano promised to call the Hazens the next day, but he never did.

35. Over the course of the next nine and one-half months, the Hazens continued to demand that Lugano repay them their money and interest, but Lugano either ignored their demands or kept stalling for time.

36. By May 9, 2025, the Hazens' considerable patience was at an end and they told Lugano they were worried it would not comply with the terms of the Second Contract and the Third Contract. Three days later, on May 12, 2025, Ferder claimed that he had resigned from Lugano and that the company had appointed somebody else to deal with the parties' Second Contract and Third Contract. Ferder insisted that Lugano would repay the Hazens their money.

37. On or around May 7, 2025, Compass filed a Form 8-K with the SEC, which stated that Ferder had resigned as Lugano's CEO. The Form 8-K also said that Compass' Audit Committee hired outside legal and accounting firms to investigate Lugano's "financing, accounting, and inventory practices," given "certain unrecorded financing arrangements and irregularities identified in sales, cost of sales, inventory, and accounts receivable." Additionally, Compass took the extraordinary measures of (i) advising its shareholders and the market not to rely upon Compass' 2024 consolidated financial statements, earnings statements, and other related documents; (ii) canceling its next earnings conference call; (iii)

delaying its 10-Q Quarterly Report; and (iv) postponing its regularly scheduled 2025 annual meeting of stockholders.

38. On May 13, 2025, the BBD Gift Trust assigned its interest in the Second Contract and in the Blue Diamond to The Paul and Cassandra Hazen Trust.

39. On May 21, 2025, the Hazens demanded that Lugano repay their money by June 2, 2025, or they would sue.

40. Lugano failed to comply with the Hazens' demand for repayment.

41. Shortly thereafter, Lugano advised the Hazens in writing that Lugano could not find the Co-Owned Diamonds described in the Second Contract and in the Third Contract in its inventory.

42. Upon information and belief, Ferder has fled the United States and, based on the foregoing events, the United States Securities and Exchange Commission has opened a criminal and/or civil investigation into Ferder and Lugano.

## FIRST CLAIM FOR RELIEF
## BREACH OF CONTRACT

43. The Hazens repeat and reallege each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

44. The Hazens and Lugano entered into valid, binding, and enforceable contracts, namely the Second Contract and Third Contract.

45. The Hazens complied in full with all material terms of Second Contract and Third Contract.

46. By engaging in the actions and inactions complained of herein, Lugano breached the terms of the Second Contract and Third Contract.

47. Lugano breached the Second Contract and Third Contract by, among other things, refusing to repay the Hazens their money and interest.

48. Lugano breached the Second Contract and Third Contract by, among other things, stating that the Co-Owned Diamonds were in Lugano's possession and

8

ownership at the time the parties entered into the Second Contract and Third Contract, which was untrue.

49. Lugano breached the Second Contract and Third Contract by, among other things, either forging GIA certificates for the Co-Owned Diamonds or providing the certificates of other unrelated diamonds to the Hazens in order to induce them to enter into the Second Contract and the Third Contract.

50. Lugano breached the Second Contract and Third Contract by, among other things, falsely stating that Lugano would market and sell the Co-Owned Diamonds thereafter.

51. Lugano further breached the Second Contract and Third Contract by, among other things, repeatedly intentionally lying to the Hazens, including as recently as May 2025, that the Co-Owned Diamonds were in Lugano's possession.

52. As a direct and proximate result of Lugano's breach of the Second Contract and the Third Contract, the Hazens have been and will be damaged in an amount in excess of $75,000.

53. As a direct and proximate result of Lugano's breach of the Second Contract and the Third Contract, the Hazens have been required to retain the services of attorneys to prosecute this action and are therefore entitled to recover their attorneys' fees and costs.

## SECOND CLAIM FOR RELIEF

## TORTIOUS BREACH OF THE IMPLIED COVENANT OF

## GOOD FAITH AND FAIR DEALING

54. The Hazens repeat and reallege each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

55. Every contract carries an implied covenant of good faith and fair dealing.

56. The Second Contract and the Third Contract each include an implied covenant of good faith and fair dealing.

9

4914-2198-6404, v. 1

57. Lugano cultivated a relationship of special trust and confidence with the Hazens through Ferder by Ferder telling them he was Lugano's President and CEO and by representing to them that, as Lugano's President and CEO, he was someone they could trust. As set forth above, Ferder initially worked to gain the Hazens' trust by entering into and performing the terms of the First Contract for the purpose of fraudulently inducing the Hazens into entering into the Second Contract and the Third Contract.

58. The Hazens fulfilled all of their duties and obligations with respect to the terms and conditions contained within the Second Contract and the Third Contract.

59. Lugano deliberately and tortiously breached the implied covenant of good faith and fair dealing by engaging in the actions and inactions complained of herein including, without limitation, by fraudulently representing to the Hazens that it would perform its obligations under the Second Contract and Third Contract.

60. With respect to the Second Contract and Third Contract, Lugano did not act fairly and in good faith, but rather, acted tortiously and in bad faith.

61. As a direct and proximate result of Lugano's actions and inactions constituting a tortious breach of the implied covenant of good faith and fair dealing, the Hazens have been and will be damaged in an amount in excess of $75,000.

62. As a direct and proximate result of Lugano's tortious breach of the implied covenant of good faith and fair dealing, the Hazens have been required to retain the services of attorneys to prosecute this action and are therefore entitled to recover their attorneys' fees and costs.

63. Lugano committed the acts complained of herein with oppression or malice, and in conscious and deliberate disregarded of the Hazen's rights, entitling them to an award of punitive and/or exemplary damages in an amount to be determined at trial.

///

4914-2198-6404, v. 1

## THIRD CLAIM FOR RELIEF
## UNJUST ENRICHMENT

64. The Hazens repeat and reallege each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

65. By wiring millions of dollars to Lugano, the Hazens conferred a valuable benefit upon Lugano, which benefit Lugano appreciated and acknowledged.

66. Lugano accepted and retained the benefits conferred upon it under circumstances where it would be inequitable for it to do so without payment of value for the same.

67. As a direct and proximate result of Lugano's actions and inactions, the Hazens have been damaged in an amount exceeding $75,000.

68. As a direct and proximate result of Lugano's acts of unjust enrichment, the Hazens have been required to retain the services of attorneys to prosecute this action and are therefore entitled to recover their attorneys' fees and costs.

## FOURTH CLAIM FOR RELIEF
## FRAUD

69. The Hazens repeat and reallege each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

70. Lugano, through Ferder, made numerous misrepresentations to the Hazens to gain their trust and confidence and induce them into entering into and performing the Second Contract and the Third Contract.

71. To induce the Hazens into entering into the Second Contract and the Third Contract, Lugano presented the Hazens with GIA certificates that were forged, false, or falsely represented to be certificates belonging to the diamonds referenced in the Second Contract and the Third Contract.

72. When the parties entered into the Second Contract and Third Contract, Lugano falsely stated to the Hazens that Lugano would market and sell the Co-

11

4914-2198-6404, v. 1

Owned Diamonds thereafter and split the proceeds with the Hazens, when Lugano had no intention of doing so.

73. From the time that the parties entered into the Second Contract and Third Contract until May 2025, Lugano repeatedly lied to the Hazens by telling them that the Co-Owned Diamonds listed in the Second Contract and Third Contract remained in Lugano's possession, custody and control.

74. At the time each misrepresentation listed above was made, Lugano knew it was false or made it recklessly without regard for the truth.

75. At the time each misrepresentation listed above was made, Lugano intended for the Hazens to rely upon each false representation.

76. The Hazens reasonably relied on Lugano's misrepresentations in entering into the Second Contract and Third Contract and performing thereunder, including wiring Lugano millions of dollars.

77. As a direct, actual and proximate cause of Lugano's actions, the Hazens have been damaged in an amount in excess of $75,000, plus interest thereon.

78. The Hazens have been required to retain the services of attorneys to pursue the foregoing claim for relief, and have been further damaged thereby, and therefore are entitled to recover their attorneys' fees and costs.

79. Lugano committed the acts complained of herein with oppression or malice, and in conscious and deliberate disregarded of the Hazens' rights, entitling the Hazens to an award of punitive and/or exemplary damages in an amount to be determined at the time of trial in this matter.

## FIFTH CLAIM FOR RELIEF
## ACTION FOR FINANCIAL ABUSE OF ELDERS
## PURSUANT TO CAL. WIC § 15600 ET SEQ.

80. The Hazens repeat and reallege each and every allegation contained in the foregoing paragraphs as though fully set forth herein.

81. Paul Hazen and Cassandra Hazen are each "elders" under California

4914-2198-6404, v. 1

law because they are each over the age of 65 and were so at all times alleged herein.

82. Given the circumstances surrounding the parties' entry into the Three Contracts, including the many fraudulent misrepresentations alleged above, Lugano either took, appropriated, obtained, or retained the Hazens' personal property—meaning the Co-Owned Diamonds—or assisted therein, all for a wrongful use and/or with the intention to defraud.

83. Lugano has therefore committed "financial abuse" of the Hazens under California law.

84. As a direct, actual and proximate cause of Lugano's actions, the Hazens have been damaged in an amount in excess of $75,000, plus interest thereon.

85. Lugano's conduct was, therefore, a substantial factor in causing the harm the Hazens suffered.

86. The Hazens have been required to retain the services of attorneys to pursue the foregoing claim for relief, and have been further damaged thereby, and therefore are entitled to recover their attorneys' fees and costs.

87. Lugano committed the acts complained of herein with oppression or malice, and in conscious and deliberate disregarded of the Hazens' rights, entitling them to an award of exemplary and/or punitive damages in an amount to be determined at the time of trial.

## JURY DEMAND

The Hazens demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, The Hazens pray for judgment against Lugano as follows:

1. For a judgment in favor of the Hazens and against Lugano on all claims for relief asserted herein;

2. For compensatory, incidental and consequential damages in an amount in excess of $75,000;

3. For a finding that Lugano's actions were intentional, willful and

malicious, and that the Hazens are entitled to punitive and exemplary damages;

4. For a finding that Lugano's actions constituted the financial abuse of elders under California law;

5. For pre-judgment and post-judgment interest on all amounts due, at the highest rate permitted pursuant to applicable law;

6. For an award of attorneys' fees and costs incurred in this action; and

7. For such other and further relief as this Court deems just and proper.

DATED: this 28th day of August, 2025

Respectfully submitted,

HOWARD & HOWARD ATTORNEYS

By: */s/ Joanna M. Myers*
Joanna M. Myers, Esq.
Mark J. Gardberg, Esq.
Robert L. Rosenthal, Esq.
3800 Howard Hughes Pkwy., Suite 1000
Las Vegas, NV 89169

Kevin A. Hoang, Esq.
9595 Wilshire Blvd., Suite 900
Beverly Hills, CA 90212

*Attorneys for Plaintiffs*

4914-2198-6404, v. 1